IN THE UNITED STATES DISTRICT COURT FOR THE
NOTHERN DISTRICT OF OKLAHOMA

LARRY DALE POTTER, JR.,           )
                                  )
    Plaintiff,                    )
                                  )
v.                                )   Case No. 14-CV-424-PJC
                                  )
CAROLYN W. COLVIN,                )
                                  )
    Acting Commissioner of the    )
    Social Security Administration, )
                                  )
    Defendant.                    )

## OPINION AND ORDER

Claimant, Larry Dale Potter, Jr. ("Potter"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability benefits under the Social Security Act, 42 U.S.C §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(C)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Potter appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Potter was not disabled. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

### Claimant's Testimony

Potter was 46 years old at the time of the hearing before the ALJ on December 12, 2012. (R. 39). He had an Associate's Degree in Liberal Arts. (R. 44). Potter had worked as a pipe fitter, delivery driver, forklift operator, swimming pool technician, and blueprint detailer. (R. 70-71). Potter's most recent job was as a pipe fitter, which ended when he was terminated in March 2009 when he could no longer perform his job after surgical removal of his big toe. (R.

1

50). He had worked at that particular position for 15 years. *Id*. Potter complained he was unable to work due to neuropathy, ulcers and bone removals from his feet. (R. 41, 45). Potter also testified that he had diabetes, back problems (R. 46-47).

Potter testified that four bones had been removed from his left foot, as well as two or three from his right foot. (R. 66). He estimated he could walk a block when he did not have ulcers on his feet, and he could stand for 2 ½ hours before having to sit for 10-15 minutes. (R. 48). Potter testified he needed to put his feet up regularly and, if he was allowed to do so, he might be able to work. (R. 60). He stated he could lift up to 15 pounds, but weight hurt his back. (R. 46). Potter would elevate his feet half of the day, as prescribed by his doctor. (R. 49). His feet would get painful and swollen when he stood. (R. 54). His feet constantly felt as if they were asleep with pins and needles shooting through them. *Id*.

Potter experienced numbness from his mid-calves down through his feet, which caused him to lose his balance a couple of times a day. (R. 57). Potter stated he also had poor circulation in his lower trunk, and if he bumped a padded surface he would develop an open sore. (R. 49-50). At the time of the ALJ's decision, Potter testified to smoking two packs of cigarettes a week, but was in the process of cutting back. (R. 53). He had been told that this added to his health problems and the problems with circulation in his lower trunk. *Id*. Potter also had diabetes, but it was under better control because he was being educated by a clinic about the condition. (R. 61). He did, however, continue to have issues with the disease, as his diabetic retinopathy and blurred vision caused him to use prescription glasses. (R. 61). The glasses, however, would only work for several months before needing to be changed. *Id*. Potter also wore diabetic shoes and inserts regularly. *Id*.

**Medical Evidence of Record**

Potter went to Claremore Indian Hospital ("Claremore") on July 2, 2008 with complaints of blisters present on both big toes for four weeks, which were now swelling and draining. (R. 318-22). He reported that had untreated diabetes and he had been given an antibiotic at another facility the week before. (R. 318). It was noted that there was a deep ulcer on his left foot and a 3/4" circle on his right big toe that was swollen and erythematous;[1] however no drainage was found. (R. 319). Potter was referred to podiatry concerning his feet and prescribed medication for his diabetes and high blood pressure (R. 321-22).

On July 9, 2008, Potter had a diabetes management appointment at Claremore. (R. 315-17). It was noted that he had been diagnosed with diabetes type 2 at least 10 years prior but had never attended any classes or met with a dietitian on how to control it. (R. 315). He reported that it had never been under control and he now had difficulty with his vision and bone infections, but was on medication and had foot surgery scheduled soon. *Id*. He was provided education on monitoring, nutrition, supplies, and medical appointments. (R. 316-17).

Potter returned to Claremore on July 11, 2008 to check his blood sugar levels in preparation for upcoming surgery. (R. 311-12). His diagnoses were type 2 diabetes, uncontrolled, but benign hypertension, low HDL, and mild nephropathy.[2] (R. 311).

Potter had foot surgery on July 14, 2008 and returned to Claremore on July 17, 2008 to drain his wound. (R. 310).

On January 19, 2010, Potter presented to the Claremore Emergency Room complaining of left foot pain and two diabetic ulcers on his left foot. (R. 306-08, 326-27). Radiology

---

[1] This indicates redness of the skin produced by congestion of capillaries. *Dorland's Illustrated Medical Dictionary* 650-51 (31st ed. 2007) (hereinafter "*Dorland's*").

[2] Nephropathy indicates a disease of the kidneys. *Dorland's* at 1261.

3

revealed a soft tissue ulcer, heel spurs, and atherosclerosis.[3] (R. 326). He was advised to follow up at the clinic and provided diabetic supplies. (R. 293-94, 306).

The next day, on January 20, 2010, Potter returned to Claremore for a diabetic foot care appointment and indicated a desire to re-establish care. (R. 304-05). He indicated he'd had two ulcers on his left foot for approximately one year. (R. 304). The ulcers were observed on his first and fifth toes, with callus buildup, and both measured approximately 3/4 centimeters deep. *Id.* He reported that they had worsened and he reported stabbing, shooting pain on the fifth toe. *Id.* His calluses were trimmed, and the ulcers were bandaged. *Id.*

On January 25, 2010, Potter presented to Claremore Podiatry for a pre-op appointment. (R. 298-303, 325). Because he was a current smoker, x-rays were taken and he was cleared by radiology for surgery. *Id.* Subsequently, on January 29, 2010, Potter had an operation on his left foot performed by Nathan Lashley, D.P.M. (R. 290-91, 295-96, 324, 337). He had an excision of his fifth metatarsal head, his tibial sesamoid, and 2 ulcerations. *Id.* He was given post-op instructions and was to follow up in one week. (R. 296).

Potter had his first post-op appointment at Claremore Podiatry on February 4, 2010. (R. 288-89). It was noted that his dressings were clean and dry and that there was no drainage or disruption. (R. 288). He was instructed to keep his dressing dry and not remove it and was to be strictly non-weight-bearing, using crutches. (R. 289). Potter returned again on February 11, 2010. (R. 286-87). It was noted that the foot site was clean and dry with no edema, drainage or erythema. (R. 286). Some of his sutures were removed and new dressing was applied. (R. 287). He was instructed to continue using crutches. *Id.*

---

[3] Atherosclerosis is the thickening of the walls of arteries with formation of yellowish plaques. *Dorland's* at 146, 174.

On February 18, 2010, Potter presented to Claremore Podiatry without using his crutches, against instruction. (R. 284-85). He indicated that he had changed his dressing himself after it had gotten wet. (R. 284). Dr. Lashley removed Potter's remaining sutures. (R. 285).

On February 23, 2010, Potter presented to Claremore for a diabetic medical evaluation. (R. 272-82). He reported his blood sugars had been running high and had been taking more insulin than prescribed to get his blood sugar down. (R. 273). He was diagnosed with uncontrolled type 2 diabetes, hypertension and hyperlipidemia. (R. 274). His medications were adjusted and he was instructed to follow up with the optometrist because photos taken of his eye exam showed hemorrhages. (R. 272-82).

On August 6, 2010, Claremore dispensed shoes and orthoses inserts to Potter, who reported no new or acute problems. (R. 270). Also on that day, it was recommended that Potter buy drugstore reading glasses rather than purchasing bifocals. (R. 268-70).

On September 7, 2010, Potter presented to Claremore for a follow-up appointment concerning his diabetes and hypertension. (R. 260-67). He spent considerable time being educated on diabetes and proper insulin use, as he reported he was not told how to dose and he had been using random amounts. (R. 260). There were no notations concerning problems with his feet. (R. 260-67).

On October 6, 2010, Potter was seen at Claremore for cellulitis[4] in his right hand, caused by a puncture while fishing. (R. 251-59). Potter reported that he was an MRSA carrier and had frequent infections. (R. 251). Potter's right hand was inflamed and tender, with hand redness and streaking onto the thumb. (R. 253). It was noted that Potter's diet was still uncontrolled and

---

[4] Cellulitis is a bacterial skin infection. *Dorland's* at 330.

5

he'd had a significant weight gain; there were no complaints of foot pain. (R. 251). Potter was prescribed antibiotics and ointment for the infection. (R. 255).

Potter presented to Claremore's emergency room on November 11, 2010 with continued complaints of thumb pain from his hand infection. (R. 246-49). He was given another prescription of oral and topical antibiotics for the infection. (R. 249).

On August 12, 2011, Potter came in for a footwear fitting at Claremore for new diabetic shoes. (R. 372). It was noted that there were new callus formations on both feet. *Id*. When he picked them up on September 16, 2011, it was noted that there were no new or acute problems and that the shoes fit with no adjustments needed. (R. 384).

Potter was seen at the Sapulpa Indian Health Center ("IHC") on September 26, 2011 (R. 391, 393-400). The notes are handwritten and partially difficult to decipher, but it appears to have been a routine appointment, possibly to establish care. (R. 391). Potter reported uncontrolled diabetes, pain in his right little finger, an increase in his blood sugar levels, neuropathy, dyslipidemia, benign hypertension, obesity and depression. It was noted that he was an unemployed pipefitter and he would walk "some of [the] day." *Id*. Anger and anxiety were also noted. *Id*. Diabetic supplies and prescriptions were provided. *Id*.

On October 11, 2011, Potter returned to the IHC for a recheck of his diabetes. (R. 385). He reported feeling better and was happy and less irritable. *Id*.

On October 30, 2011, Potter presented to Bailey Medical Center with complaints of pain and swelling of the right foot. (R. 379-82). He was diagnosed with cellulitis and given an antibiotic to treat the infection, as well as Lortab for pain relief, and instructed to return in two days for another examination. *Id*.

On November 2, 2011, Potter presented to Claremore for a follow-up appointment concerning his hand and with complaints of right foot pain and swelling. (R. 383). It was noted that the hand infection had resolved and Potter denied any associated redness, swelling, or drainage. *Id*. Examination of Potter's foot revealed no open lesions, no edema, erythema, or acute sign of infection, and pulses were palpable. However, his right food had diffuse hyperkeratosis[5] a loss of protective sensation and decreased ankle jerk. Potter was assessed with equinus,[6] keratoma,[7] and diabetes, type 2 with loss of protective sensation. *Id*. The callus was pared down and Potter was instructed to finish his antibiotics and return in one month. *Id*.

On August 4, 2012, Potter presented to the emergency department at Claremore, reporting pain and swelling in his right foot that had lasted four days. (R. 423-27). Potter described the pain as pressure, radiating, sharp, and shooting, which was worsened by standing and walking. (R. 425). Robert W. King, M.D., observed that the foot had generalized edema and tenderness with a plantar callus cracking open, however there was no bleeding or drainage. (R. 424). Potter was given an antibiotic and was instructed to use a walking boot or crutches, and referred Potter to podiatry. *Id*.

Dr. Lashley saw Potter in the podiatry clinic on August 17, 2012. (R. 422). Dr. Lashley noted tenderness to palpation with edema and mild erythema,[8] as well as an open fissure. *Id*. Dr. Lashley reviewed x-rays taken by the emergency department and diagnosed Potter with

---

[5] Hyperkeratosis indicates the overgrowth of skin. *Dorland*'s at 902, 910.

[6] This is a foot deformity in which the plantar is flexed, causing a person to walk on the toes without touching the heel. *Dorland's* at 647, 1893.

[7] Keratoma is the medical term for callus. *Dorland's* at 995.

[8] Erythema is redness of the skin caused by congestion of capillaries. *Dorland's* at 650.

symptomatic accessory bone 5th metatarsal base and recommended removal of the accessory bone in the future. *Id*.

Potter reported that conservative treatment of the plantar wound on his right foot did not help and he requested surgical correction. (R. 416-21). The surgery was completed on September 14, 2012 at Claremore. (R. 411-15). He underwent endoscopic gastrocnemius recession ("EGR"), resection of the accessory bone and resection of the 5th metatarsal head on the right foot. *Id*. At his follow-up appointment on September 20, 2012, Dr. Lashley observed that Potter's foot was healing well, with no edema, erythema or drainage. (R. 410). Potter was instructed to continue using crutches and to return in one week. (R. 410).

## Examinations and Evaluations by Agency Consultants

Agency consultant Seth Nodine, M.D., conducted an examination of Potter on January 5, 2011. (R. 433-39). Potter reported a lengthy history of uncontrolled diabetes, which resulted in swelling and numbness in his feet, as well a multiple ulcers, requiring surgery. (R. 433). He reported difficulty standing due to worsening of pain and numbness. *Id*.

Dr. Nodine observed that Potter had intact cranial nerves, and that he was alert and oriented to person, place, and time. (R. 434). However, Dr. Nodine noticed a marked decreased sensation in the stocking distribution[9] in Potter, and Potter was unable to feel fine touch with a paperclip on the soles of both feet. *Id*. He became aware of the sensation as Dr. Nodine worked his way up to the ankles, although it was still decreased in this area. *Id*. Dr. Nodine also observed that Potter had callous formation without ulcers on the bottoms of his feet, as well as dirt and decreased hygiene. *Id*. Dr. Nodine observed that Potter's skin changed to more of a

---

[9] Stocking distribution refers to a sensory neuropathy of several peripheral nerves in the limbs wherein there is a loss of pain, touch, temperature, position and vibration sensation, accompanied by paresthesia, which is an abnormal touch sensation, such as burning or prickling, often in the absence of an external stimulus. *Dorland's* at 1287, 1404, 1513, 1718.

8

hyper-pigmented purplish appearance on his foot. *Id*. Dr. Nodine also noted that any touch to Potter's foot caused Potter pain with tenderness to palpitation. *Id*.

Potter exhibited the ability to walk on tiptoes and heels and he ambulated at a normal and steady gait without the use of an assisted device. (R. 435, 438). Straight leg raises were negative. (R. 438). Potter exhibited normal rapid hand and finger to nose movement, as well as a normal range of joint motion in all of his joints. (R. 434, 436-37). Dr. Nodine observed that Potter's skin was intact, with no rashes or legions. (R. 435). Potter was assessed with insulin dependent diabetes, most likely type I overall, while he also had components of type II insulin dependence since age 15, with marked decreased sensations of the feet leading to previous ulcer debridements, osteomyelitis[10] and near amputation. *Id*. Dr. Nodine also noted that Potter had severe peripheral neuropathy[11], decreased distribution sensation in the stocking distribution, particularly on the soles of his feet, poor foot hygiene, and a callous formation present with pain, which was made worse with increased standing. *Id*.

Agency consultant Beth Jeffries, Ph.D., conducted a mental status examination of Potter on January 15, 2011. (R. 442-46). His primary complaints concerned his diabetes, and foot and back pain. (R. 442). Potter admitted a history of alcohol and drug use, but denied current use. *Id.* Potter denied current suicidal ideation, but reported past suicidal ideation. (R. 443). He indicated that he had only one friend and was able to complete his activities of daily living. *Id*. Dr. Jeffries noted Potter had normal speech, appearance, attention, and energy; she also noted he was cooperative, with a steady and upbeat mood and a full range of affect. *Id.* However, Potter

---

[10] Osteomyelitis is an inflammation of the bone caused by infection. *Dorland's* at 1368.

[11] Peripheral Neuropathy is a functional disturbance or pathological change in several nerves on the outward part or surface of a structure simultaneously. *Dorland's* at 1287-88, 1437, 1513.

reported that his mood was angry, although he rated his mood over the last two weeks as an 8 on a scale of 0-10, with 10 being happy. *Id*.

Dr. Jeffries indicated Potter's thought process was logical and goal-directed, and his concentration, memory, judgment, and insight appeared to be intact. (R. 443-44). She estimated his IQ to be above 80. (R. 444). Potter was diagnosed with adult antisocial behavior and alcohol abuse, reportedly in remission. *Id*. Dr. Jeffries commented that Potter did not meet the criteria for a major mood or thought disorder, or for a major depression or anxiety disorder. (R. 445). She opined that he would be able to perform in his chosen occupation without mood symptoms. *Id*.

A Psychiatric Review Technique ("PRT") form was completed by an unnamed agency consultant on March 4, 2011.[12] (R. 358-71). The consultant indicated that Potter had a non-severe medically determinable impairment, antisocial behavior, for Listing 12.08. (R. 358, 365). For the "Paragraph B Criteria," the consultant found that Potter had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, maintaining concentration, persistence, or pace, and had not experience any periods of decompensation. (R. 368). In the narrative section, the consultant summarized Dr. Jeffries's report in some detail. (R. 370). The consultant noted Potter's reported activities of daily living. *Id*. The consultant concluded that Potter's mental impairments were non-severe. *Id.*

On March 9, 2011, non-examining agency consultant, Richard K. Lyon, Ph.D., noted that there had been no allegation of a worsening of any previously documented impairments, nor were there any allegations of new impairments. (R. 349). Also, Dr. Lyon noted that Potter had

---

[12] The form itself is actually undated. (R. 358-371). However, a case analysis dated March 9, 2011, refers to a March 4, 2011 PRT, and there is only one PRT within the administrative record. (R. 349).

not received any treatment for any mental impairment. Id. Dr. Lyon affirmed the March 4, 2011 PRT as written.

Non-examining agency consultant Donald Baldwin, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") on March 22, 2011. (R. 350-57). Dr. Baldwin determined that Potter could occasionally lift and/or carry 10 pounds, and frequently lift and/or carry less than 10 pounds. *Id*. It was also noted that Potter could stand and/or walk at least 2 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday. *Id*. No other limitations were found. (R. 351-54). In the narrative portion of the form, Dr. Baldwin reviewed Dr. Nodine's examination, Potter's complaints and medical history, his previous work limitations and his activities of daily living. (R. 351-52, 357).

On September 17, 2011, non-examining agency consultant Dana M. Cox, Ph.D., affirmed the March 9, 2011 PRT as written after review of all of the medical evidence. (R. 376). On October 4, 2011, non-examining agency consultant Charles K. Lee, M.D., affirmed both the March 9, 2011 PRT and Dr. Baldwin's March 22, 2011 RFC after review of the medical evidence. (R. 377-78).

**Procedural History**

Potter filed his application for disability insurance benefits on December 9, 2010. (R. 159-60). He applied for supplemental security income benefits on January 10, 2011. (R. 161-65). On his application for disability income, Potter asserted onset of disability on August 11, 2008, and in his application for social security income he asserted onset of disability on December 11, 2010. (R. 159, 161). An administrative hearing was held before ALJ Edmund C. Werre on October 10, 2012. (R. 34-77). At this hearing, Potter amended his alleged onset date to August 31, 2010. (R. 29). By decision dated December 12, 2012, the ALJ found that Potter

was not disabled. (R. 13-33). On May 28, 2014, the Appeals Council denied review. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[13] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id*.

---

[13] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(C). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listen in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. This court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id*. (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin*, 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

In his decision, the ALJ found that Potter met insured status requirements through September 30, 2015. (R. 18). At Step One, the ALJ found that Potter had not engaged in any substantial gainful activity since his alleged onset date of August 31, 2010. (R. 18). At Step Two, the ALJ found that Potter had severe impairments of a left knee impairment, diabetes mellitus with peripheral neuropathy, and hypertension. (R. 19). The ALJ found that Potter's reports of bipolar disorder and antisocial personality disorder, considered singly and in combination, were nonsevere. *Id*. The ALJ found that Potter's report of vision problems was nonsevere. (R. 21). At Step Three, the ALJ found that Potter's impairments, or combination of impairments, did not meet any Listing. *Id*.

The ALJ found that Potter had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with the following limitations: lifting up to 10 pounds; standing

13

and/or walking 2 hours out of an 8-hour workday; sitting 6 hours out of an 8-hour workday; no climbing ladders, ropes, or scaffolds; and no exposure to hazards such as unprotected heights and being around dangerous moving. *Id*. At Step Four, the ALJ determined that Potter could return to past relevant work. (R. 28). In the alternative, at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Potter could perform, taking into account his age, education, work experience, and RFC. *Id*. Therefore, the ALJ found that Potter was not disabled at any time from August 31, 2010, through the date of his decision. (R. 29).

## Review

The only error Potter asserts on appeal is that the ALJ failed in his duty to develop the record by not ordering an electromyogram ("EMG").[14] Regarding this issue, the Court finds the ALJ's decision is supported by substantial evidence and complies with the legal requirements. Thus, the ALJ's Decision is **AFFIRMED.**

**Development of the Record**

The Court notes that at the end of the hearing, Potter's counsel requested an EMG to evaluate his neuropathy. (R. 76). Counsel stated, "I don't see anywhere on his records that he's had any sort of electromyogram or any sort of testing for the neuropathy. If the court feels it's necessary, I think that would substantiate his claims of the numbness and the need to put his feet up." *Id*. The ALJ indicated he would take it under advisement, and in his decision stated:

> The attorney requested at hearing that additional electrocardiogram testing be performed if the [ALJ] deemed necessary. . . . No requests for this testing have been requested until day of the hearing. The claimant has not reported additional symptoms. No treating doctor has requested or suggested this testing is necessary. Additionally, this testing would not reasonable [*sic*] affect the above sedentary residual functional capacity.

---

[14]An electromyogram test assesses the muscles and the nerves that control those muscles. *Dorland's* at 609.

(R. 27-28, 76).

The ALJ did not ignore Potter's complaints of neuropathy in his decision. First, in summarizing Potter's testimony, the ALJ noted that it felt like Potter's feet were asleep with pins and needles and that he experience numbness. (R. 23). He noted that Potter did not wear his diabetic shoes in spite of his neuropathy. (R. 23, 27). The ALJ summarized Dr. Nodine's examination and findings of decreased sensation, as well as his ability to walk on tiptoes and heals and ambulate normally without the use of an assistive device. (R. 25). The ALJ also noted Dr. Nodine's diagnoses of decreased sensations and severe peripheral neuropathy. *Id*. He noted Potter's lack of medical compliance and observed that he did well when he was compliant with medications and physician recommendations. (R. 24-27). He stated that there were no medical records indicating Potter needed to elevate his feet 50% of the time as alleged, nor were there any restrictions placed on Potter by his treating physicians. (R. 27). At Step Two, the ALJ specifically found that Potter's diabetes mellitus with peripheral neuropathy was a severe impairment. (R. 19). The Tenth Circuit has often stated that the court takes the ALJ at his word when he states that he has considered all of the evidence. *Wall*, 561 F.3d at 1070. The reference described above are sufficient to show the ALJ considered the evidence related to Potter's neuropathy.

An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Dept. of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993). However, the ALJ has "broad latitude" in ordering consultative examinations and "does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997); *accord e.g.*, *Lundgren v. Colvin*, 512 Fed. Appx. 875 (10th Cir.

15

2013) (unpublished); *Harlan v. Astrue*, 510 Fed. Appx. 708 (10th Cir. 2013) (unpublished). The ALJ may rely on a claimant's counsel to identify an issue requiring development, "but that issue must also be 'substantial' 'on its face.'" *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (*quoting Hawkins*, 113 F.3d at 1167). It is the claimant's burden to ensure there is sufficient evidence suggesting a "reasonable possibility that a severe impairment exists." *Wall*, 561 F.3d at 1063 (quotation omitted).

In *Hawkins*, the Tenth Circuit summarized three instances in which a consultative examination might be required: (1) when there is a direct conflict in the medical evidence; (2) when the medical evidence is inconclusive; and (3) when additional tests are required to explain a diagnosis already contained in the record. 113 F.3d at 1166-70.

As discussed above, Potter's counsel requested testing at the hearing because he asserted that it would substantiate Potter's claims of neuropathy and the need to put his feet up. (R. 76). Potter did not explain in his brief how his request for EMG testing falls into the three categories described by the Tenth Circuit in *Hawkins*, and the Court finds that it does not meet the requirements of those categories. In Potter's case, there is no conflict in the medical evidence regarding his neuropathy; the medical evidence regarding his neuropathy is not inconclusive; and the additional tests requested is not required to explain Potter's diabetic neuropathy. Instead, there was objective evidence in the record that Potter suffered from neuropathy, and the ALJ adequately considered that evidence and commented that EMG testing would not affect a sedentary RFC. (R. 28). The agency non-examining consultant, Dr. Baldwin, explicitly acknowledged and summarized the evidence of Potter's neuropathy. (R. 357). In spite of this evidence, Dr. Baldwin concluded that Potter was capable of sedentary work. *Id.* Dr. Baldwin's opinion was substantial evidence upon which the ALJ was entitled to rely. *Flaherty v. Astrue*,

16

515 F.3d 1067, 1071 (10th Cir. 2007) (non-examining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of agency non-examining physician was substantial evidence supporting ALJ's conclusion); *Barrett v. Astrue*, 340 Fed. Appx. 481, 485 (10th Cir. 2009) (unpublished) (ALJ was entitled to rely upon opinion of non-examining psychiatrist). Dr. Baldwin's explicit consideration of the medical evidence of record relating to Potter's complaints of diabetic neuropathy buttresses the ALJ's conclusions regarding Potter's RFC and eliminates any question that the ALJ's decision is supported by substantial evidence.

Given the "broad latitude" of the ALJ in ordering consultative examinations, the substantial evidence supporting the ALJ's sedentary RFC, the ALJ's extensive credibility assessment, and the specific reasons provided by the ALJ for denying additional testing, the undersigned finds no error in the ALJ's duty to develop the record and failure to order an additional consultative examination. *Hawkins*, 113 F.3d at 1166.

## Conclusion

The ALJ's decision is supported by substantial evidence and complies with legal requirements. Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED**.

Dated this 28th day of August 2015.

_____
Paul J. Cleary
United States Magistrate Judge